## STEWART *v.* HUNTINGTON.

*(Supreme Court, General Term, First Department.* May 17, 1888.)

1. ACTION—INCONSISTENT CAUSES—ELECTION.

In an action on a contract for the sale of stocks, which stipulated that if plaintiff might demand return of the stocks on repayment of the price, and also that, if defendants should pay any other person for the same kind of stocks more than they paid plaintiff, they would pay him the difference on his sale, where it is sought to enforce liability for failure to return the stocks, and also for refusal to pay such difference, the causes of action are inconsistent, and plaintiff was properly required to elect on which he would proceed.

2. SAME—ELECTION—EFFECT.

The effect of such election, when made by plaintiff, is to eliminate the other cause of action from the record, and no claim can be advanced thereon, on appeal.

DANIELS, J., dissents.

Appeal from circuit court, New York county.

Action by David Stewart against Collis P. Huntington and others, of whom Huntington only was served, for breach of a contract for the sale of railroad stock, wherein it was agreed that, if plaintiff, after examination, should be dissatisfied, defendant would return the stock to plaintiff on repayment of the price, and also that if defendant should purchase other stock, and pay therefor more than the price paid plaintiff for his stock, he would pay plaintiff the difference. Judgment for defendants, by direction of the court. Plaintiff appeals.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Joseph H. Choate* and *Evarts, Choate & Beaman,* for appellant. *James C. Carter* and *Bangs, Stetson, Tracy & McVeagh,* for respondent.

VAN BRUNT, P. J. In view of the conclusion arrived at by the general term upon the previous appeal in this case, the same questions being involved upon this appeal, the judgment of the court below should be affirmed, with costs. After the reversal by the general term of the judgment heretofore entered upon the first trial, when the case came up at the circuit for a retrial, the pleadings were the same as they were before, and presented the same causes of action and defenses. In the complaint were alleged two inconsistent causes of action, and at the conclusion of the evidence the plaintiff was called upon to elect upon which cause of action he claimed to recover. The court was justified in compelling this election, because, as has already been said, the two causes of action were inconsistent, and a recovery must be had upon either one or the other, and could not be claimed upon both.

The plaintiff having made his election as to which of these causes of action he claims a recovery, no claim upon this appeal could possibly be advanced upon the other, because such cause of action was by the election necessarily eliminated from the record. The general term having already decided that no recovery could be had upon the cause of action selected by the plaintiff, the necessary consequence was that the court was justified in directing the verdict which it did, and it was probably for the purpose of reviewing the previous decision of the general term that this course was adopted by the counsel for the plaintiff. The same questions being involved on this appeal as were involved when the case was before the court before, the same conclusion should be arrived at, and the judgment affirmed, with costs, as has already been stated.

BRADY, J., concurs.

DANIELS, J., (*dissenting.*) The action was for the recovery of damages for the non-performance of a contract entered into upon the sale, by the plaintiff to the defendant, of 200 shares of stock of the Central Pacific Railroad Com-

pany of California. The sale was made in April, 1870. The plaintiff was induced to make it by the solicitation and representations of the defendant. He was disinclined at first to make the sale of his stock, desiring delay for investigation into the condition of the company, which was represented by the defendant not to be entirely satisfactory. The defendant objected to any delay in the transaction, and, to induce the plaintiff to make an immediate sale, the evidence directly tended to prove an agreement on the part of the defendant that if Mr. Aspinwall, who also owned and sold other stock to the defendant in the same company, should not be satisfied with the sale when he reached California, the defendant would return the stock to the plaintiff upon being paid back the money that was received for it, and also that if he paid any other person, for the same kind of stock, more than par, and interest at the rate of 7 per cent. upon it, which was the price paid to the plaintiff, he would pay him the difference between the sum paid and this price. Shortly after the agreement was made Mr. Aspinwall went to California, and in two or three weeks afterwards telegraphed to the plaintiff that they had made a mistake in selling their stock to the defendant, and directing the plaintiff to apply to the defendant for a return of the certificates upon payment of the amount advanced. The plaintiff did so apply to the defendant for the return of the certificates for the shares of stock, but he declined to return them, alleging that the certificates had then been canceled. The defendant, however, did offer to return certificates of stock that had been issued by another company, which had absorbed or consolidated with the Central Pacific. These shares were offered at 90 cents on the dollar, but the plaintiff declined to receive the shares, insisting upon the return of the certificates which he had delivered under the agreement to the defendant. But, as that could not be done because of their alleged cancellation, the transaction between the parties remained in this condition, and was the subject of frequent conversations and negotiations afterwards, but nothing resulted from the negotiations changing this relation of the parties to the controversy. It was soon afterwards discovered by the plaintiff, and the other persons who at the same time sold their certificates of stock to the defendant, that near the time when the sales were made shares of stock in the same company had been purchased in the state of California for a price exceeding the sum of $400 a share, and 7 per cent. interest thereon. After the discovery of this fact a further demand was made by the plaintiff upon the defendant for the payment to him of the difference between the price he had received for his shares and the amount in this manner paid for shares in the state of California. This was also refused by the defendant, and in 1877, after frequent efforts for an adjustment of the differences between the parties were ineffectually made, this action was commenced, and by the complaint the plaintiff's demand was presented in each of these aspects, a liability of the defendant being asserted for the failure to return the stock, and also for the failure and refusal to pay the difference between the price for which it had been purchased and the price paid for stock in the same company in the state of California.

The evidence taken upon the trial was directed to the support of the plaintiff's action in both of these aspects. At the close of the plaintiff's proof he was required by the court to elect upon which of the claims made in this manner he would rest his right to recover. To that ruling he objected and excepted, on the ground that this general term, upon an appeal from a preceding judgment, had determined that the plaintiff did not have alternative rights or remedies against the defendant, but was limited to the recovery of damages for the refusal to return the stock when that was demanded, after the telegraphic message received from Mr. Aspinwall. This court, on that occasion, did so decide, and, under the decision made in that manner, the plaintiff's action was limited to the right to recover damages for the refusal to return the stock. There was, consequently, no reason for requiring any

election as to the grounds upon which the plaintiff would place his right to recover after he had been restricted in this manner by the decision of the general term. The plaintiff, upon the decision being made, did, however, elect to recover the difference between the price paid for the stock and that for which purchases were alleged to have been made in the state of California. That was precisely what the general term, in its preceding decision, had held that he could not do, and, having placed himself in this condition by his election, the court, at the trial, then had but one alternative, and that was either to dismiss the complaint or to direct a verdict for the defendant. And after the close of the proof, on the application of the defendant, the latter course was adopted. And it may follow, because the court in this manner directed the plaintiff to elect, that the judgment recovered was erroneous, or that a new trial should be ordered. It was essential to the right of the plaintiff to maintain the action in either form that the fact should be proved, either that the stock was worth more than the price paid for it by the defendant, or that he had paid a larger price for stock of the same company at or after the time when the sale was made by the plaintiff. And evidence was introduced upon the trial to prove the fact that a larger sum had been paid by the defendant for shares of stock in the same company than that which the plaintiff had received, and inferentially that the shares were worth more than the plaintiff had been paid. This proof was given mostly by depositions taken in the state of California, but not questioned or controverted by other direct proof upon the trial, showing that stock had been purchased there for which a price exceeding $400 a share had been paid. These purchases were stated to have been made by a company called the "Contract & Finance Company," which had been incorporated under the laws of California, for the construction, in whole or in part, of the railroad of the Central Pacific Company. The associates owning the stock, and being officers of this company, at the time when the purchases were made, were the defendant, Mark Hopkins, Charles Crocker, and Leland Stanford. And the purchases appear to have been made after a consultation or reference of the propriety of doing so to the defendant, and with his assent and authority, and they were made through the agency of Leland Stanford, who was nominally a defendant in this action. And on the purchase of a part of the shares promissory notes were given by Leland Stanford, Mark Hopkins, C. P. Huntington, C. & E. B. Crocker. It was, however, stated that the notes were given in this form by these individuals for the reason that the parties in interest entitled to receive the purchase price declined to accept the notes of the Contract & Finance Company, but that they were ultimately paid or provided for by that company. These shares, as well as others which were purchased, and those obtained from the plaintiff and through the other purchases made at the same time, were turned over to the Contract & Finance Company, and in the final settlement, or preceding that, of the affairs of this company, credit for the shares, and the shares themselves, were apportioned between Leland Stanford, Mark Hopkins, Charles Crocker, and C. P. Huntington. They were the associates owning the stock of the Contract & Finance Company, and being at least a majority of its directors and officers; and as the purchases were made in this manner, they were, to the extent of the defendant's interest, purchases by and for him of the stock of the railroad company, for the Contract & Finance Company was evidently no more than the medium in whose name the purchases were made by and for the benefit of these individuals. And if the evidence relating to these transactions had extended no further, then it would beyond question have directly tended to support the right of the plaintiff to recover, in one form or the other, the difference between the price paid for his stock and that paid for these shares in the state of California. But proof was given by which it was established as a fact that an action was about to be commenced in favor of the owners of 475 shares of the stock against the railroad

company, the Contract & Finance Company, and these associates, to compel them to account for property and moneys received by the finance company, and the owners of its stock, which, it was alleged, belonged and should be paid over to the railroad company, which, being under the control and management of these associates, for that reason would not bring or prosecute the action itself. A bill of complaint was prepared for the purpose of prosecuting that action; and it was after these facts became known to the defendant and the other persons associated with him, as the owners of the stock of the Contract & Finance Company, that the shares themselves of the complainants in the proposed action were purchased. In justification of that course it was stated in the course of the evidence that the settlement with these dissatisfied shareholders was made in order to protect the credit of the company, and to avoid embarrassment or defeat, in the negotiation and sale of $5,000,000 in amount of railroad securities; that the fact of this suit and others having been threatened, and the publicity given to the charges, had created the belief that dishonest management did prevail in the affairs of the railroad company, and led the public to distrust the good faith of its transaction, and that it was to compromise the controversy affecting in this manner the credit of the company; that the settlement was made and the stocks were purchased in the manner already stated. A suit was commenced by an owner of other certificates of shares in the railroad company for the benefit of himself and all other stockholders who should come in and contribute to the costs and expenses of the action. This suit was commenced by another and different attorney from the attorney who had prepared the bill in what was called the "Lambard Case," and who was paid $90,000 for his services in that controversy, and the agreement that he would take no other proceedings and bring no other action against these defendants. The basis of the suit which was commenced by Samuel Brannan was his title to 200 shares of the stock of the railroad company, and in support of the action he alleged that these officers, Leland Stanford, C. P. Huntington, Mark Hopkins, Charles and E. B. Crocker, had received large amounts, aggregating many millions of the property, bonds, and money of the railroad company, for which they should account and pay to that company, and demanded as part of the relief in the action such an accounting and payment. After its commencement this suit was in like manner settled and adjusted, the sum of over $400 a share being paid for the stock, which was the basis of the action; and the inducements leading to the settlement are stated in the evidence to have been the same as those which actuated the parties in adjusting the Lambard controversy. In each instance the settlements were made by the agreement to pay, and the payment of, a fixed or lump sum of money. No specified amount was mentioned as the price of the shares in either settlement, but they, together with these other elements or inducements to settle, were aggregated, and a gross sum paid to compromise and extinguish these controversies. It could not, consequently, with any reason or propriety, be said that any specific sum of money had been paid in these adjustments as the price of the shares of stock. How much of the money paid was for the adjustment of the controversy itself, and how much for the shares, was not stated, and, indeed, could not be from the manner in which the business had been done. No evidence was given through or by which the jury could distinguish one part of the transaction from the other. They had no proof before them on which they could say with any reasonable certainty how much in this adjustment was allowed for these shares of stock. It is very probable that more than the moneys paid to the plaintiff for his shares were paid to these shareholders, who in this manner had drawn into controversy the management and liability of the defendant and his associates, of the money and property of the railroad company, but what that amount may have been there was no means for precisely determining. It was left wholly to conjecture, and that the jury were not at

liberty to do for the purpose of maintaining the plaintiff's right to damages under the branch of the agreement to pay him the same price paid to these other persons.

The evidence given by the witness Aspinwall, that the defendant had stated to him that he had paid the sum of $400 a share for the stock of the company, has not been overlooked; neither was it when the case was before the general term after the recovery of the first judgment. But while that statement was made, it is evident, from the further examination of the witness, that it related to the purchase of the stocks under the circumstances already stated. It was done by way of settlement and compromise, and not in the ordinary course of the sales of the stock of the company; and this evidence added no greater force in the way of maintaining the action in the form finally taken by the counsel than the other testimony, given in great detail, showing the manner and motives leading to the purchase of the shares in the state of California. The defendant did not agree to pay to the plaintiff, as the value of the shares sold by him, the price paid for shares by way of an adjustment of a serious legal controversy; but what the plaintiff was to have the benefit of by this part of the agreement was the value or price of shares purchased by the defendant, either individually or jointly with others, in the ordinary course of such transactions. The fact did not support the plaintiff's right to this payment that the associates in the Contract & Finance Company had, as they are stated to have done, absorbed a very large amount of the property and profits of the railroad company itself, and that they adjusted the controversies of the dissatisfied shareholders for the purpose of more completely securing to themselves the misappropriation of bonds, property, and moneys alleged to have taken place, in support of the action proposed to be commenced, and of the suit which actually was commenced. The circumstances prior to the transactions alleged, and at the time when the suit was commenced, did afford reason for believing that the charges made against them were not wholly destitute of foundation. The adjustments which they made confirmed this supposition. But these facts do not aid or benefit the plaintiff in his right to maintain this action for the recovery of the advanced price paid. He was not entitled to maintain this suit for that price, because the defendant and the other three associates with him in the Contract & Finance Company had enriched themselves by the misappropriation of the property and moneys of the railroad company. But the right to complain of such misconduct did exist in favor of the railroad company itself, and the owners of its stock; and as that company was controlled by the defendant and his three other associates, and for that reason could not vindicate these rights by action, the stockholders complaining of this misconduct have the right to institute and prosecute actions for the redress of the railroad company in these respects, and to obtain an accounting and delivery of the property improperly abstracted to that company for their benefit and the benefit of all other persons who were stockholders in the railroad company. The right as well as the remedy was limited to these persons.

But while these facts appear to be conclusive against the plaintiff's right to recover the difference between the price paid for his shares and the price in this manner paid for the shares in the state of California, they are not entitled to the same effect under the other branch of the agreement. By that part of the agreement the defendant agreed to return the shares to the plaintiff upon the money being refunded in case Mr. Aspinwall proved to be dissatisfied with the sale when he reached California. He was dissatisfied, and that fact was communicated to the defendant, and he was requested to return the shares, and the money which had been received for them was proposed to be paid to him. That he refused to do, but if, instead of this refusal, he had returned the shares, the plaintiff would have been in the same situation as the shareholders were who proposed to commence the first suit, and as the stock-

holder was who did commence the suit for a settlement and adjustment of the affairs of the railroad company. He could then either have joined in the action which was commenced, or brought an action in his own behalf, or in behalf of himself and his associates, for an accounting by the defendant and those identified in interest with him, as well as by the Contract & Finance Company, of the property and effects acquired by them of the railroad company, and upon such accounting secured a decree, if the proof would warrant it, directing the return and refunding to the railroad company of the money and property improperly withheld from it by the defendant and his associates. As a stockholder in the railroad company, under the circumstances disclosed by this evidence, he would then have been at liberty to have prosecuted and maintained such an action, and in its adjustment would probably have secured equally advantageous terms with those conceded to the other stockholders in the settlements made with them, and that would probably have secured to him as favorable terms as were accorded to these other dissatisfied stockholders. And that he could, if his shares had been returned to him, have maintained such an action, and would have done so, is probable from the fact that he acquired information of the payment of these large prices for the stock in the controversy in the state of California prior to or about the time when the Brannan suit was made the subject of adjustment. The Lambard claims were settled in June, 1870, while the Brannan suit was not commenced until the latter part of the same month; and as early as June or July the defendant was requested to return the stock or pay the difference upon the information which had been received that over $400 a share had been paid on account of the shares which were returned in the settlement of these two controversies in the state of California. What took place there certainly indicated the value of the shares to be more than the price paid by the defendant to the plaintiff, and, if they had been restored to him, by their instrumentality he would probably have been able to have secured as favorable terms from the defendant as was conceded to the owners of the shares who threatened, and the owner who brought, the action for the accounting. The plaintiff being entitled to stand in this position under this part of the contract for the enforcement of his rights, if the shares had been returned to him as the contract provided they should be, was entitled to have all the evidence which had been taken concerning the controversies and the settlements in the state of California considered by the jury upon the value of the shares which the defendant had obtained and refused to restore. The plaintiff was in a situation in which he could insist, if he had the shares to act upon, that he could have maintained an action and secured a like result with that which followed the controversies and commencement of the suit in California, and that, after deducting whatever expenditures he might be expected to incur in reaching that result, the residue of the amount awarded would have afforded some criterion for determining the actual value of the shares themselves. And as to that value, inasmuch as the return of the shares had been refused, he seems to have been entitled on this basis to submit his case to the jury. It was for them, under this branch of it, to determine whether the shares were worth more, and if so, how much more, than the defendant himself had paid for them, as he had failed to fulfill his contract by refusing to return them. And in view of what had transpired, and of the remedy which the plaintiff might have pursued if the shares had been returned to him, and what had been done in the other controversies, the jury would have been able to have reached an intelligent result as to what was the probable value of the shares which the plaintiff sold and delivered to the defendant. He was entitled to submit this part of the controversy to the jury by the decision previously made by this general term. And that was all which the decision left to him. He was not precluded from asserting the value of the shares to be greater than the price which had been paid. Neither was he from using the evidence in the case,

so far as it had a tendency to prove the value to be greater than the price paid. Neither was the consideration in any form excluded from the jury that if the shares had been returned to him he might have maintained an action in the form commenced by Brannan, and either in its determination or adjustment have recovered a sum as the value of the shares exceeding that which had been received by him. What the court should have done was to have denied the application to require the plaintiff to elect between the different branches of the contract alleged to have been violated in the complaint, and restricted the action to the claim made for damages for the failure to return the shares when they were demanded of him by the plaintiff. That would have left this part of the case entirely free and unembarrassed, and in a condition to be submitted to the jury as to the conclusions to be drawn from the facts and circumstances proved by the evidence given upon the trial. The election of the plaintiff to proceed under the other branch of the agreement in no manner corrected this error. It is entirely apparent that the election was not the one which the circumstances required to be made. But as the decision directing an election to be made was not warranted by the condition of the action under the decision of the general term, the plaintiff has not been deprived of his right to complain of it, and to urge it as a ground for the reversal of the judgment by the subsequent action of his counsel in making this election. The part of the case depending upon the agreement made for the return of the stock was entirely free and unembarrassed, and the subject of unfettered litigation, so far as the preceding decision of the general term extended. That was left open between these parties, and the court should have so ruled upon the trial, and restricted the controversy to that part of the agreement. In this respect an erroneous disposition appears to have been made of the case at the trial, and to correct it both the judgment and the order should be reversed, and a new trial directed, with costs to the plaintiff to abide the event.